UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| GARY BROWN, | ) |
| | ) |
| Movant, | ) |
| | ) |
| v. | ) Civil No. 08-403-P-S |
| | ) Crim. No. 05-70-P-S |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION**

Gary Brown is serving a life sentence after being convicted of federal narcotics charges. Brown has filed a 28 U.S.C. § 2255 motion which contains three grounds, all of which center on the testimony of a Maine Drug Enforcement Agent at his suppression hearing concerning the agent's interactions with a confidential informant who assisted the authorities vis-à-vis Brown's arrest. The United States has filed a motion for summary dismissal.[1] I recommend that the Court deny Brown 28 U.S.C. § 2255 relief for the reasons that follow.

## DISCUSSION

**The MDEA Agent, the CI, and the Arrest**

The First Circuit Court of Appeals summarized the facts relevant to the motion to suppress as follows:

> On July 7, 2005, Kevin Cashman, a Lewiston police officer assigned to the Maine Drug Enforcement Agency (MDEA), received a tip about an imminent narcotics transaction. Although Cashman's confidential informant (the CI) had been cooperating with the MDEA for less than a week, he already had provided

---

[1] Brown filed his reply on June 1, 2009. The reply was originally due April 27, 2009, and Brown filed a motion for a thirty-day extension on April 20, 2009. I granted his request and his response was then due on May 27, 2009. On May 22, 2009, Brown again filed a motion for extension for an unspecified period of time due to difficulties at the prison law library. On May 26, 2009, I granted an extension until July 13, 2009. Brown filed his reply on June 1, 2009, within five days of the original extension, thereby mooting the request for further extension.

Cashman with trustworthy information about sellers, transporters, and users of drugs in the Portland area.

The substance of the tip was as follows. The CI told Cashman that a black male known as "Pink" traveled weekly by bus from New York City to Maine to peddle between ten and twenty ounces of crack and powdered cocaine. He further stated that Pink's usual praxis was to stay in a hotel off the Maine Turnpike. The room that he used would be rented under the name of Tanguay (David or Peter). The CI explained that David Tanguay was currently incarcerated and that his brother, Peter, sometimes used David's identification. Other than skin color, the CI provided no physical description of the putative drug peddler.

The CI subsequently advised Cashman that "Pink" had arrived in Portland and was staying in a hotel near the Maine Turnpike. Cashman and another officer proceeded to the Ramada Inn, off former Exit 8 of the Maine Turnpike, and learned that room 127 had been rented in the name of David Tanguay. Comparison of the signatures on the registration form and the identification used in renting the room revealed marked discrepancies.

Cashman called a police dispatcher and corroborated David Tanguay's current status as a federal prison inmate. The officers then obtained access to a room diagonally across from room 127 and conducted a five-hour stake-out. While they observed a black man go in and out of room 127, limitations on their surveillance capabilities rendered them unable to identify the man.

Three weeks later, the CI told Cashman that Pink was en route to Portland on board a Vermont Transit bus from New York City. He said that the wayfarer would arrive that afternoon and would be picked up at the bus station by Peter Tanguay. Tanguay would be driving an old green pick-up truck, plate number 760-409, belonging to the CI. The CI assured Cashman that Pink would be transporting his wonted wares. He explained that he was privy to this information because he had spoken with Peter Tanguay when the latter asked to borrow his truck.

In response to this lead, Cashman called in a fellow officer, who searched both the CI and his truck to ensure the absence of any preexisting contraband. The CI drove away and the officers tailed the truck. They saw Peter Tanguay enter it. After the truck made several stops, Tanguay drove away alone. The officers continued to follow the truck until it reached the bus terminal.

At 3:30 p.m., the officers saw a Vermont Transit bus arrive from New York City. They watched a black man alight carrying two large duffel bags. The man walked to the truck, placed the duffel bags in the cab, and climbed aboard.

By prearrangement, two Portland police cruisers converged on the truck a short distance from the bus terminal. Officer Robert Bickford directed the passenger to disembark, frisked him, and asked for his name and date of birth. The passenger identified himself as Anthony Green, gave a date of birth, and claimed to be from Boston. He appeared older than the proffered date of birth suggested. Moreover, he professed to have no identification and, when asked how to spell his name, he hesitated.

>Bickford tried unsuccessfully to verify the passenger's stated identity using the computer in his cruiser. He eventually asked the man for his social security number, but "Green" said that he did not remember it. When Cashman showed up, he inquired as to the ownership of the duffel bags. Tanguay claimed ownership and Green, in an apparent effort to substantiate that claim, stated that the bags had been in the truck when he arrived. The surveilling officers knew that statement to be untrue.
>
>The officers (whom the magistrate judge credited) asserted that throughout this exchange Green was constantly looking around, as if looking for a way to escape. When asked a second time for identification, he tried to peer into Bickford's notebook, as if trying to recollect the name that he had given.
>
>A canine unit arrived at the scene around thirty minutes after the stop was effected. A trained "drug dog" reacted to a scent emanating from the cab of the truck and, later, alerted to one of the duffel bags. The bag was found to contain 340 grams of crack cocaine as well as numerous small bags of marijuana. A search of the truck's glove compartment revealed additional cocaine. Both the driver (Peter Tanguay) and the passenger were arrested. Police subsequently identified the passenger as Gary Brown.

United States v. Brown, 500 F.3d 48, 51 -53 (1st Cir. 2007).

**Brown's 28 U.S.C. 2255 Challenges Concerning his Post-Suppression Hearing Attorney, Cashman's Testimony about his Contact with the CI, and Brown's Description of the Newly Discovered Evidence**

Brown complains that the attorney who represented him after the suppression hearing[2] did not take the right steps when a subsequent private investigation by the defense raised some doubt about the testimony of Cashman concerning his confidential informant. Brown believes that the private investigator's report of his conversation with the CI is material to whether the CI provided Cashman with reliable information, is evidence that Cashman fabricated some of his testimony, and calls into question whether there was probable cause.[3]

Brown contends in his first § 2255 ground that his attorney should have notified the court when the investigator uncovered possible inconsistencies in the agent's testimony. In his

---

[2] The attorney who represented Brown at the suppression hearing was replaced by an attorney from the same law firm.

[3] The United States does object to Brown's reliance on this report for the truth of the matter of what the CI said on hearsay grounds. Because I conclude that even if the court considers the contents of this report Brown is not entitled to § 2255 relief, I do not address this concern.

3

second § 2255 ground Brown contends that counsel should have sought a reopening of the suppression hearing based on these same inconsistencies. And in his third § 2255 ground Brown insists that the same set of facts concerning the testimony of Cashman violated his due process rights; he suggests that new evidence justifies bringing this claim in the context of a 28 U.S.C. § 2255 proceeding.

    Brown describes his new evidence as follows. The CI was arrested on July 7, 2005, and prior to that date he describes himself as not cooperating with the MDEA agent.[4] Brown also indicates that the CI told the investigator that a few days prior to Brown's July 29, 2005, arrest Cashman was "forcefully dissatisfied" with the CI's lack of cooperation but at Brown's suppression hearing Cashman testified that this witness had been proven reliable. He points to contradictions in the testimony of Cashman at the suppression hearing in comparison to his trial testimony with respect to whether or not he searched the CI's truck prior to the CI's trip to the bus stop. Brown maintains that the CI conceded to his investigator that he purposefully contaminated the vehicle with drug residue after the alleged search but before the arrest so that the drug sniffing dogs would be alerted and that Cashman had be told this information.[5] Lastly,

---

[4] In his reply brief Brown explains that he thinks that Cashman's version of the pre-July 7, 2005, communications with the CI are fabricated because July 7 was the day that the CI was arrested and that it is unlikely that the CI could have contacted Cashman before this date. (Reply Mem. at 13.) He rejects the United States' supposition that perhaps the CI was released from state charges on this date (and was cooperating while held on those state charges), describing it as "grasping at straws." (Id.; see also Gov't Mot. Summ. Dismissal at 25.) Brown adds that the CI told the private investigator that he was arrested after dark on July 7 (Reply Mem. at 13), but the affidavit of the investigator submitted by Brown does not support this representation (Doc. No. 2-4 at 2). The affidavit of the investigator actually describes how the CI viewed himself as only a person of interest prior to his July 7, 2005, arrest. (Doc. No. 2-4 at 2.) It does state that the CI told the investigator that July 7 was the first date the CI had contact with Cashman.

[5] In his reply memorandum Brown revisits this contention arguing that the United States' assertion that the sniffing dogs alerted to the two bags placed into the truck by Brown before it alerted to the glove compartment by insisting that it would have demonstrated that the CI acted in an illegal manner. (Reply Mem. at 11-12.) He opines that it "goes beyond comprehension to think that a Magistrate would allow such a practice to stand." (Id. at 12; see also id. at 14-15.) In Brown's view, the admission by the CI that he planted the drugs in the truck is too troublesome to be overlooked or ignored. (Id. at 15.)

Brown points to the fact that the CI had testified that he had seen Brown's drug trafficking yet was unable to pick Brown out of a photo line-up of black males.

Brown says he discussed with his attorney the implication of the CI's representation that he only started cooperating with Cashman on July 7, 2005, the same day of the Ramada Inn surveillance and how he was going to use the information garnered by the investigator. His attorney said he was unsure of what he could do with the information, that they should focus on the upcoming trial, and he failed to even notify the court of the new evidence. [6]

Magistrate Judge Cohen addressed Brown's challenge to Agent Cashman's reliance on the CI in the following manner in his recommend decision on the motion to suppress:

> The defendant contends that the information from the confidential informant "bears no indicia of reliability." To the contrary, Cashman testified that the confidential informant had previously provided information which proved to be reliable. Counsel for the defendant made much at oral argument of the fact that the agents "found no evidence of any wrongdoing" during their surveillance at the Ramada Inn on July 7, 2005 and that the defendant's girlfriend and mother both testified that he was with them in the Bronx on that date, but the agents were able

---

[6]  Brown represents in his affidavit:

    I remember discussing with Attorney Lynch, that how is it possible that Cashman conducted a "5 ½ hour surveillance" of a hotel room if he was busy arresting Carl that day, (July 7th, 2005) and how could Carl have provided "information" prior to July, 7th 2005 if as Cashman testified he (Carl) became an informant after Cashman arrested him, and he knew him "less than a week."

    I distinctively remember asking Attorney Lynch since there is proof that it is documented – IE (the motion filed on Carl's behalf, the police report that Cashman wrote,) and since we now have possession of it shouldn't we alert the court, to inform them of Cashman's fraudulent testimony, on direct, and on cross examination, during the suppression hearing.

    I remember Attorney Lynch's respond being he was "unsure" of what he could do with this "new evidence" and it would have been better to have known about the arrest of Halvor Carl prior to my "suppression hearing."

    On April 21st 2006, I had my next conference with Attorney Lynch, again I brought up the discussion about what could be done about the information provided by the private investigator Bauer, all Attorney Lynch stated was he thought he should "focus on the upcoming trial" (which was less than a month away).

    Subsequently Attorney Lynch neglected to even notify the Court of the fraudulent testimony of Kevin Cashman used by the Government (and adopted by the Magistrate at my suppression hearing) to obtain a "denial" of my motion to suppress.

(Brown Aff. ¶¶ 21-25.)

>   to confirm the confidential informant's statement that a black male was registered as "David Tanguay," that the identification card of a David Tanguay who was in prison had been used to register for the room and that it was likely that someone other than the David Tanguay who signed the identification card had signed the hotel register. Cashman could not say whether the black male he observed coming and going from the room was the defendant. This fact alone does not make the confidential informant's information unreliable. See United States v. Diallo, 29 F.3d 23, 26 (1st Cir.1994) (inconsistencies between informant's tip and reality not of such importance that information must be concluded to be incorrect; enough that prudent law enforcement officer would reasonably conclude that likelihood existed that criminal activities [were] afoot and defendant probably engaged in them). Even if the testimony of the defendant's girlfriend and mother is credited, the information provided by the confidential informant on July 29, 2005 was all verified up to the time the stop was made. Peter Tanguay did borrow the confidential informant's truck and park it at the bus station, where a black male carrying two duffel bags got off the bus that was scheduled to arrive at 3:05 p.m. and went straight to the truck. The confidential informant's information had sufficient indicia of reliability. See Terry v. Ohio, 392 U.S. 1, 26-27 (1968); United States v. Chhien, 266 F.3d 1, 6 (1st Cir.2001) (traffic stop must be supported by reasonable and articulable suspicion of criminal activity; reasonable suspicion does not require probable cause).

United States v. Brown, Crim No. 05-70-B-S, 2006 WL 149031, 5 (D.Me. Jan. 17, 2006) (recommended decision)(record citation omitted), aff'd, 2006 WL 348318 (D. Me. Feb. 14, 2006).

In ruling on his direct appeal the First Circuit Court of Appeals took a very lengthy look at Brown's challenge to law enforcement's reliance on the CI. Citing Illinois v. Gates, 462 U.S. 213 (1983) and Alabama v. White, 496 U.S. 325 (1990), the Panel explained:

>   In this instance, the CI was not a model citizen-he sported a criminal record and unresolved state criminal charges were looming. The defendant asserts that the police knew little or nothing more about the CI. He adds that, although no money had been offered or explicit promises made, the CI obviously expected a good reference from the officers to the local district attorney as a quid pro quo for the tip.
>   This assertion understates what the police knew and when they knew it. For one thing, the CI was not anonymous. Since he was known to the police, he could have been held accountable if his information proved inaccurate or false. Cf. Adams v. Williams, 407 U.S. 143, 146-47 (1972) (suggesting that informant's reliability was buttressed by the fact that he risked prosecution should he make a

6

false report). For another thing, at the time of the tip that prompted the arrest, the CI had been cooperating with the authorities for approximately one month. During that period, Cashman had several interactions with him. Moreover, even prior to July 7, the CI had provided trustworthy information and had demonstrated his knowledge of the drug trade in the Portland area. Thus, by July 29 the CI had compiled some record of reliability.

To be sure, factors like an informant's prior criminal record and desire to advantage himself with respect to pending criminal charges are to be considered in evaluating his reliability. But such considerations are not dispositive. The fact of the matter is that those who possess information about the inner workings of the drug trade are unlikely to be persons of impeccable moral integrity. While the source's general credibility must be considered, all that the law requires is that, when all the pertinent considerations are weighed, the information reasonably appears to be reliable. See Gates, 462 U.S. at 230.

There is no point in beating a dead horse. In this case, the character, quality, and subsequent corroboration of the tip made it sufficiently reliable to provide a "specific and articulable" predicate for the investigatory stop. Terry, 392 U.S. at 21.

Central to this conclusion is the fact that the CI provided a plethora of details about the alleged drug trafficker's modus operandi-and a tip that describes the criminal activity in detail is more likely to be reliable. See Spinelli v. United States, 393 U.S. 410, 416(1969); cf. United States v. Barnard, 299 F.3d 90, 93 (1st Cir.2002) ("The credibility of an informant is enhanced to the extent he has provided information that indicates first-hand knowledge.").

To illustrate, the CI specified the type and quantity of the drugs in transit, the transporter's method of travel, what bus line he would patronize, and the name of one of his confederates (Peter Tanguay). He also specified the date, time, and place of the suspect's arrival in Portland, the identity of the person who would meet him there, the exact vehicle that would be deployed, and the suspect's intended destination. In short, the tip was sufficiently laden with details to demonstrate that the CI had inside knowledge of the events that he was describing.

The defendant's attack on this panoply of facts is impuissant. As framed, that attack places undue emphasis on the CI's inability to provide a detailed physical description of the alleged drug trafficker. Although vague or ubiquitous descriptions may raise Fourth Amendment concerns, see, e.g., United States v. Hudson, 405 F.3d 425, 438-39 (6th Cir.2005), everything depends on context.

In this instance, we believe that the CI's description, viewed in light of the totality of the circumstances, was constitutionally sufficient to justify reasonable suspicion. Even though he did not recount the precise physical characteristics of the alleged drug trafficker, he specified the suspect's race-a datum that the police regularly use to facilitate identification, see 4 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 9.5(g), at 555-56 n. 376 (4th ed.2004)-and he supplied pertinent details about the suspect's whereabouts, associates, activities, and destination. As a result, the police were not simply

7

> looking for a black man; they were looking for a black man getting off the afternoon bus from New York City on July 29, at the Vermont Transit bus terminal in Portland, carrying illegal drugs, and being met by Peter Tanguay in the CI's green pick-up truck. We find that description constitutionally sufficient.
>
> The defendant's asseveration that the police failed adequately to corroborate the tip is equally unavailing. The record, fairly read, suggests the opposite. In terms of corroboration, the authorities need not totally eliminate the risk that an informant is providing erroneous information. That would be an unrealistically heavy burden, and the law does not impose it: the police need only act with due diligence to reduce the risk of a mendacious or misguided informant. See United States v. Winchenbach, 197 F.3d 548, 556 (1st Cir.1999).
>
> In the case at hand, the police adequately discharged this duty through direct surveillance and fact-checking. See United States v. Jordan, 999 F.2d 11, 14 (1st Cir.1993). Although they were frustrated in their efforts to make a positive identification in consequence of the July 7 tip, they were able to corroborate that certain events had taken place exactly as the CI had predicted ( e.g., that a hotel room had been rented in the name of David Tanguay and that David Tanguay was incarcerated at the time). With respect to the July 29 tip, the police corroborated virtually every aspect of the account given by the CI. No more was exigible.

Brown, 500 F.3d at 54 -56 (footnote omitted).

With regards to my 28 U.S.C. § 2255 review of Brown's two ineffective assistance grounds, the First Circuit summarized the standard for 28 U.S.C. § 2255 ineffective assistance claims in United States v. De La Cruz:

> The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). In order to prevail, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). In other words, a defendant must demonstrate both seriously-deficient performance on the part of his counsel and prejudice resulting there from. In this case, Defendant has demonstrated neither.

514 F.3d 121, 140 (1st Cir. 2008).

"When a petition is brought under section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing." United States v. McGill, 11 F.3d 223, 225 (1st

Cir.1993)(citations omitted).  "A district court may forego such a hearing when 'the movant's allegations, even if true, do not entitle him to relief, or ... [when] the movant's allegations "need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible." ' "  Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007) (quoting David v. United States, 134 F.3d 470, 477 (1st Cir.1998)); see also McGill, 11 F.3d at 225 ("In determining whether the petitioner has carried the devoir of persuasion in this respect, the court must take many of petitioner's factual averments as true, but the court need not give weight to conclusory allegations…") (citations omitted).  Furthermore, when a "petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing."  McGill, 11 F.3d at 225.

With respect to Brown's two ineffective assistance grounds, Brown admits that his attorney made a considered choice not to try to move to reopen the motion to suppress based on the information provided by the private investigator.  This is facially a strategic choice that falls within the range of Sixth Amendment reasonableness.  See Strickland, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'") (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). In his reply brief Brown envisions that had counsel informed the court and moved to reopen the suppression hearing he would have been able to "pick apart" Cashman's "incredible tale" by seeking discovery as to whether or not there were any rooms ever rented to "David Tanguay" or if there were ever MDEA agents at the Ramada Inn on July 7, 2005.  (Reply Mem. at 3.) Brown speculates that if Cashman really

believed that his CI was credible and if he really saw highly suspicious activity on that night involving a black man entering a room registered to a white federal prison inmate he would not have called off his surveillance. (Id. at 3,5) [7] He thinks his attorney could have contacted Ramada Inn employees present on July 7, 2005, and he could have ascertained if there were security cameras, both efforts that would have been towards discovering if there was a black man going in and out of Room 127. (Id. at 6.) Brown also thinks that counsel could have found out if the hotel kept any records of police surveillance of that room and insists that counsel should have tried to get the license plate number of the car the white male who left the Ramada Inn was driving that night. (Id.)[8] As both Magistrate Judge Cohen's and the First Circuit discussion make clear, Brown's focus on the details of the events of July 7, 2005, does not materially advance his claim that there was a viable basis to challenge the probable cause on July 29, 2005. I am confident that had counsel notified the court and/or moved to reopen the suppression hearing based on the information gleaned from the private investigator he would have been firmly rebuffed; quibbling with the court about the credibility of a witness at the suppression hearing with less than one month to go until trial would not have been a successful tactic.[9] "Counsel is not required to waste the court's time with futile or frivolous motions." United States v. Wright,

---

[7] In his reply brief Brown indicates that the CI told the private investigator that he never gave Cashman any information that would lead to the surveillance of a hotel (id. at 4, 6) but the affidavit of the investigator does not support this assertion (Doc. No. 2-4 at 2). In his reply Brown also indicates that -- as to the July 29, 2005, incident – the CI told Cashman that he knew that Peter Tanguay only wanted to borrow the truck to go to the bus station but the CI was not sure of the time that Peter was to pick up 'Pink.' (Id. at 6-7.) This also is not supported by the affidavit. (Doc. No. 2-4 at 2.) It is Brown's assertion that this affidavit was in no way altered or doctored. (Reply Mem. at 15.)

[8] In his reply brief Brown goes off on a riff about counsel's failure to object to hearsay testimony at trial. (Reply Br. at 9-11.) This is certainly an entirely new claim given the original fabric of the 28 U.S.C. § 2255 motion. He also explores a discontent about the placement of a recording device in the truck prior to Brown's arrest. (Id. at 13.) He faults the United States for not producing tapes from this supposed device. (Id.) This assertion about the prosecution's possible misconduct also does not relate to Brown's § 2255 grounds.

[9] The recommended decision was issued on January 17, 2006. It was affirmed on February 14, 2006. Brown indicates that he met with the private investigator on April 10, 2006, and again on April 21, 2006. This was the time-frame he pressed counsel to move to reopen the suppression hearing. Trial began on May 15, 2006.

573 F.2d 681, 684 (1st Cir. 1978); see also United State v. Hart, 933 F.2d 80, 83 (1st Cir. 1991) ("[S]everal First Circuit cases have upheld counsel's right to ignore frivolous claims pressed by clients.").

What is more, with regards to his post-suppression-hearing attorney's general performance and his tactical decisions, counsel did try to raise the issues presented by the investigator concerning the details of the CI's report as to the July 7, 2005, surveillance but this Court concluded that it was irrelevant given the soundness of the information leading to the July 29, 2005, arrest. (See Trial Tr. at 18-20, 244-45, 301.) And it is not of minor moment that the same attorney who represented Brown in the aftermath of the motion to suppress made significant arguments before the First Circuit in pressing Brown's challenge to the reliability of the informant.

The reasons behind my conclusion that counsel would have had no grounds to move to reopen the suppression hearing on the basis of the new evidence cited by Brown also sounds the death knell for his third § 2255 ground arguing that he was denied due process when Cashman testified as to his interactions with the CI leading to Brown's arrest. The United States is willing to assume for purposes of this proceeding that the standard for a motion for a new trial based on newly discovered evidence would apply to this type of claim brought in a 28 U.S.C. § 2255 proceeding. In United States v. Wright, the First Circuit summarized:

> A motion for new trial on the basis of newly discovered evidence will ordinarily not be granted unless the moving party can demonstrate that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant. See Pelegrina v. United States, 601 F.2d 18, 20-21 (1st Cir. 1979); In re United States, 565 F.2d 173, 177 (1st Cir. 1977); Johnson v. United States, 32 F.2d 127, 129 (8th Cir.

    1929); C. Wright & A. Miller, Federal Practice and Procedure [§] 557 at 515
    (1969).

625 F.2d 1017, 1019 (1st Cir. 1980) (emphasis added). United States v. Connolly, 504 F.3d 206, 213 (1st Cir. 2007) ("[T]he Wright test categorically discounts 'merely impeaching' evidence as 'immaterial.'")(citing Wright, 625 F.2d at 1019). Brown's new evidence is merely impeaching of Cashman and, as indicated above, this Court has already made the determination at trial that it was not admissible even for that purpose. It is also safe to say that if Brown was granted a new suppression hearing or trial in which to present this evidence, there is no probability, actual or reasonable, that the introduction of the evidence would have led to a different result. See Connolly, 504 F.3d at 212-13.[10]

*Conclusion*

 For the reasons set forth above, I recommend that the Court deny Brown 28 U.S.C. § 2255 relief. I further recommend that a certificate of appealability should not issue in the event Brown files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

NOTICE

 A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

 Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

---

[10] There is no suggestion that the United States withheld information parallel to that contained in the private investigator's report from defense counsel in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963). See Connolly, 504 F.3d at 212-13.

June 8, 2009 /s/Margaret J. Kravchuk
U.S. Magistrate Judge